**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **James John Gardner**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**Kevin Merritt and North American Metallurgic Solutions, LLC**<br><br>**Defendants.** | **Civil Action No. __________**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S COMPLAINT**

## Table of Contents

I. PRELIMINARY STATEMENT ..... 3
II. PARTIES ..... 3
III. JURISDICTION AND VENUE ..... 4
IV. FACTUAL ALLEGATIONS ..... 13
A. Introduction to Steel Manufacturing and Metallurgic Briquettes ..... 13
B. Gardner Invents a Liquid Metal Binder and Metal Briquetting Process ..... 14
C. Gardner Enters into a Partnership with Merritt to Commercialize His Binder ..... 16
D. Merritt Erroneously Lists Himself as an Inventor on the Patent ..... 24
E. Merritt Creates Entities He Controls to Hold the Partnership's Assets ..... 30
F. Merritt Replaces NAMS I LLC with NAMS II LLC. ..... 33
G. The Operating Agreement and the Incentive Agreement. ..... 35
H. Gardner's Partnership Draw and Merritt's Reporting. ..... 38
I. Merritt Hides the Partnership's Business in Entities He Alone Controls. ..... 40
J. NAMS II LLC Operates Within the Partnership, Not in Place of It. ..... 41
K. Gardner Built the Partnership into a Profitable Business. ..... 42
L. The Partnership Expands and Becomes Extremely Profitable ..... 43
M. Merritt Forces Gardner Out and Claims He Owns Nothing ..... 46
V. CAUSES OF ACTION ..... 52
A. First Cause of Action - Declaratory Judgment that Gardner and Merritt are Partners (28 U.S.C. § 2201; N.Y. P'ship Law § 10) ..... 52
B. Second Cause of Action - Breach of Oral Partnership Agreement ..... 54
C. Third Cause of Action - Dissolution and Value of Gardner's Interest (N.Y. P'ship Law §§ 62, 63, 69, 73, 74) ..... 57
D. Fourth Cause of Action - Breach of Fiduciary Duty ..... 60
E. Fifth Cause of Action - Accounting (N.Y. P'ship Law §§ 43, 44) ..... 65
F. Sixth Cause of Action - Constructive Trust ..... 67
G. Seventh Cause of Action - Correction of Inventorship under 35 U.S.C. § 256 ..... 70
PRAYER FOR RELIEF ..... 72

Plaintiff James John Gardner hereby alleges the following:

## I. Preliminary Statement

1. This case is about one of the oldest schemes in business: a wealthy investor promises an inventor an equal partnership, takes what he needs, and then cuts the inventor out. Plaintiff James Gardner invented a binder that turns steel-mill waste into briquettes the mills buy back as furnace feedstock. Defendant Kevin Merritt, a former fertilizer executive with no experience in the steel or steelmaking industry, promised Gardner a 50/50 partnership based on that invention and told him he would never try to steal it. Relying on that promise, Gardner sold his other business, handed Merritt his binder formula for patent prosecution, built multiple plants, and won key customers that made the business worth millions.

2. Merritt stole it anyway. While Gardner built the business, Merritt and his lawyers built a web of entities that only Merritt controlled and moved the business, its profits, and the patent on Gardner's invention into them. Once Merritt and his hand-picked employees learned everything Gardner could teach them regarding the business and briquette production, Merritt unlawfully pushed Gardner out and kept everything. Gardner brings this action to recover his half of the business Merritt stole.

## II. Parties

3. Plaintiff James John Gardner ("Gardner" or "Plaintiff") is a New York citizen who resides in East Northport, Suffolk County, New York, which is within the Eastern District of New York.

4. Defendant Kevin Merritt ("Merritt" or "Defendant") is a Florida citizen residing at 417 Triple Crown Lane, Saint Johns, Florida 32259.

5. Defendant North American Metallurgic Solutions, LLC ("NAMS II LLC") is a Florida limited liability company, formed on February 17, 2023, with its principal place of

business at 417 Triple Crown Lane, Saint Johns, Florida 32259. It is managed by FirstQOF LLC ("**FirstQOF**") and controlled by Merritt. NAMS II LLC is the assignee of record of U.S. Patent No. 12,618,018 (the "**'018 Patent**"). According to Merritt, FirstQOF is the only member of NAMS II LLC. Upon information and belief, NAMS II LLC is a citizen of Florida. Merritt formed an earlier Florida limited liability company with the same name on December 29, 2022 ("**NAMS I LLC**") and dissolved it on February 17, 2023.

## III. Jurisdiction and Venue

6. *Subject-matter jurisdiction.* This Court has original and exclusive jurisdiction over Gardner's claim for correction of inventorship under 35 U.S.C. § 256, which arises under the patent laws of the United States. 28 U.S.C. §§ 1331, 1338(a).

7. This Court has supplemental jurisdiction over Gardner's remaining claims under 28 U.S.C. § 1367(a). Those claims and the inventorship claim arise from a common nucleus of operative facts: Gardner's invention of his binder, his disclosure and assignment of it in reliance on Merritt's promises, and Merritt's use of the patent application and the entity that holds the patent to take the invention for himself.

8. This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Gardner is a citizen of New York. Merritt is a citizen of Florida. Upon information and belief, NAMS II LLC is a citizen of Florida. The amount in controversy exceeds $75,000, exclusive of interest and costs: Gardner seeks one-half of a business that, on information and belief, generated approximately $10.9 million in revenue in 2025.

9. *Personal jurisdiction over Merritt.* This Court has personal jurisdiction over Merritt under N.Y. C.P.L.R. 302(a)(1) because he transacted business in New York and Gardner's claims arise from that business. Among other things:

10. In November and December 2022, Merritt negotiated and agreed to a 50/50 partnership with Gardner through telephone calls, texts, and emails directed to Gardner at his home in East Northport, New York. Merritt knew Gardner was a New York resident and was located in New York throughout these negotiations.

11. On January 5, 2023, Merritt sent an Agreement to Create a Business Venture (the "**Venture Agreement**"), which he had prepared, to Gardner in New York, and Gardner executed it in his home office in New York.

12. On January 13, 2023, working from his home office in New York, Gardner sent Merritt a written description of the binder formula and process he invented. Merritt prepared the patent application based on that disclosure.

13. On January 31, 2023, Merritt emailed Gardner in New York the engagement letter for the patent counsel Merritt had selected, and Gardner signed it at his home office in East Northport. Merritt likewise sent Gardner in New York the assignment of his invention, which Gardner signed there.

14. Gardner was at home in New York on February 20, 2023, when Merritt emailed him draft operating and incentive award agreements for North American Metallurgic Solutions, LLC, prepared by Merritt's lawyers. Merritt wrote: "Just in last night from Lawyers, please review and let's get it done." Gardner signed both agreements in New York on February 28, 2023.

15. Merritt signed an Exclusive Manufacturing Agreement for the partnership on December 30, 2022, in which Merritt agreed that New York law would govern and that New York would be the exclusive forum for all disputes relating to that agreement.

16. For two years, Merritt carried on the partnership's business with a partner based in New York. When Gardner was not at the plants in Kentucky or Indiana, he managed operations, developed formulations, and negotiated with customers and suppliers from his home office in East Northport, and Merritt called, texted, and emailed him there, often many times a day. Merritt knew Gardner worked for the partnership from New York.

17. In a January 3, 2025, letter, Merritt complained that Gardner's visits to Central City involved "spending one or two days on the ground before returning home."

18. Merritt caused monthly payments to be sent to Gardner's entity, Nacirema Holdings LLC ("**Nacirema**"), via Gardner's bank accounts located in East Northport, New York, and caused Forms 1099-NEC for 2023 and 2024 to be issued to Gardner's entity at its East Northport address. The 2024 form reported $180,000 in payments.

19. In January 2025, Merritt unlawfully removed Gardner from the business through communications he sent to Gardner in New York: his January 3 letter, his January 6 texts, and his counsel's January 8 letter, sent by certified mail to Gardner's home.

20. *Personal jurisdiction through the partnership.* Each partner is the agent of the partnership and of the other partner. Gardner's New York office, and the work he did there for the partnership, are therefore attributable to Merritt, just as if Merritt had done that work in New York himself.

21. The Venture Agreement Merritt prepared identified Gardner by a New York address. In January 2023, Gardner's email signature on the partnership's nametal.com domain identified him as Executive Vice President of North American Metallurgic Solutions LLC with a NY office. The engagement letter from Gray Ice Higdon, PLLC

("**Gray Ice**"), the patent counsel Merritt chose, was addressed to the company in care of Merritt in Florida and in care of Gardner in "Long Island, New York."

22. Gardner carried on the partnership's business from his home office in East Northport, New York. Acting for the partnership there, Gardner:

(a) negotiated, at Merritt's request, the Exclusive Manufacturing Agreement, in which the partnership and its out-of-state counterparty agreed that New York law would govern and that New York would be the exclusive forum for disputes;

(b) signed the Supplier 4 account agreement on the partnership's behalf in January 2023, identifying Gardner and Merritt as its co-owners;

(c) negotiated customer contracts, including the Customer 14 Agreement;

(d) developed and refined the binder formulations the partnership used;

(e) recruited personnel and managed the partnership's supplier relationships; and

(f) performed the many other tasks the partnership needed, working from his home office in New York whenever he was not at the partnership's plants in Kentucky and Indiana.

23. Gardner did that work for the partnership's benefit and Merritt's, with Merritt's knowledge, consent, and participation. As partners, they managed the business together. Merritt gave his input on the work, approved purchases, and called, texted, and emailed Gardner in New York about it, often several times a day. Merritt did not merely know that his partner lived in New York. He chose to carry on the partnership's business through a

partner working in New York, let the business present itself as having a New York office, took part in the work done there, and shared in its benefits.

24. Gardner's claims arise from the partnership and its business. His claims for a declaration of the partnership, breach of the Partnership Agreement, breach of fiduciary duty, dissolution, and an accounting concern the partnership's formation, the business it carried on, including the business carried on from New York, and Merritt's diversion of that business to himself. The accounting Gardner seeks covers the whole partnership, from its formation to the present: all of its assets, revenue, profits, and business, in whatever entity Merritt has placed or hidden them.

25. Merritt is also subject to jurisdiction under N.Y. C.P.L.R. 302(a)(3)(ii). Outside New York, he committed tortious acts, including breaches of his fiduciary duties carried out through misrepresentation and concealment, from which Gardner's claims arise, and those acts caused injury in New York. The events that caused Gardner's injury occurred here. Relying on misrepresentations and omissions that Merritt directed to him in New York, Gardner signed the Venture Agreement, the assignment of his invention, and the Operating Agreement in New York. Gardner's patented invention was conceived and developed largely in New York.

26. Merritt expected, or should reasonably have expected, his acts to have consequences in New York. He knew his partner Gardner lived and worked in New York, sent Gardner the agreements there to sign, directed the partnership's business through Gardner there, and sent the January 2025 removal communications to Gardner there. Merritt also derives substantial revenue from interstate commerce. The partnership operates plants in Kentucky and Indiana and, on information and belief, generated approximately $10.9 million in

revenue in 2025 from sales to steel producers in those states. On information and belief, Merritt personally receives substantial income from the partnership through the various partnership entities he created and controls.

27. *Personal jurisdiction over NAMS II LLC.* This Court has personal jurisdiction over NAMS II LLC under N.Y. C.P.L.R. 302(a)(1). Acting through Merritt, NAMS II LLC took the assignment of Gardner's invention from a New York resident, made monthly payments to Nacirema in New York from March 2023 until January 2025, issued Forms 1099-NEC to Nacirema at its East Northport address, had a substantial part of its operations and business development managed by Gardner from Gardner's home office in East Northport, and sent its January 8, 2025, letter to Gardner in New York. Gardner's claims against NAMS II LLC arise from those contacts: NAMS II LLC holds the '018 Patent and the partnership's property because of the assignment Gardner signed, and the work Gardner performed, in New York.

28. Exercising jurisdiction over Merritt and NAMS II LLC comports with due process. Each purposefully reached into New York to obtain a New York resident's invention and services, and each could reasonably expect to answer in New York for claims arising from that relationship.

29. *Venue.* Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Gardner's claims occurred here. Gardner conceived and developed his binder at his home in East Northport. Merritt's promises were made to Gardner here, and Gardner relied on them here. Gardner signed the Venture Agreement, the patent engagement letter, the assignment of his invention, and the Operating Agreement here, sent his written disclosure of the invention from here, and

performed a substantial part of his work for the partnership here in New York. And Merritt's communications unlawfully removing Gardner from the business were directed to Gardner here in New York.

30. *The forum-selection and choice-of-law clauses in the Operating Agreement and the Incentive Agreement do not apply.* The Operating Agreement is the February 28, 2023, operating agreement of NAMS II LLC among NAMS II LLC, FirstQOF, and Nacirema, and the Incentive Agreement is the award agreement of the same date between NAMS II LLC and Nacirema. Both are described in Section IV(G) below. The Operating Agreement provides that Florida law governs it and that actions "arising out of or based upon this Agreement" must be brought in Saint Johns County, Florida. The clause requires suit in courts "in each case located in Saint Johns County, Florida." Merritt lives in Saint Johns County, and NAMS II LLC and FirstQOF both list his home there as their principal office. The Incentive Agreement and its 2024 amendment contain similar provisions. Those clauses are not applicable to this action, for five reasons.

31. First, neither Gardner nor Merritt is a party to those agreements. The Operating Agreement is among NAMS II LLC, FirstQOF, and Nacirema, and Gardner signed it only on Nacirema's behalf, not in his individual capacity. Merritt signed it only on behalf of NAMS II LLC and FirstQOF. In the prior state-court action described below, Merritt's counsel conceded that Gardner was not a party to those agreements.

32. Second, none of Gardner's claims arise out of or are based upon the Operating Agreement or the Incentive Agreement. His claims arise from the Partnership Agreement that he and Merritt negotiated and agreed to in December 2022, from the duties partners owe each other under New York law, and from the patent laws of the United States.

Gardner does not assert rights under the Operating Agreement, the Incentive Agreement, or the 2024 amendment to the Incentive Agreement, and does not seek relief under any of them. Those agreements are pleaded only as facts showing how Merritt carried out his scheme. The Partnership Agreement, on which Gardner sues, was oral and contains no forum-selection clause.

33. Third, the partnership is far broader than NAMS II LLC, and an agreement governing that one company does not govern the partners' rights in the whole. The partnership's purpose was to commercialize Gardner's invention wherever it could be sold. Merritt has carried on that business through at least ten entities that he formed and controls. North American Trucking Company, LLC holds the trucks that haul the partnership's materials and briquettes. 800 S Pemiscot Street LLC holds the Hayti, Missouri facility. On information and belief, Nex-Core Metals LLC and Bind-Max Solutions LLC were formed to conduct partnership business in Indiana and Missouri. NAMS II LLC is only one of these entities.

34. NAMS II LLC is a tax vehicle with a narrow purpose. Its Articles of Organization limit its purpose to "the use of real estate located in Central City, Kentucky, in such a way that the Company qualifies as a 'qualified opportunity zone business.'" In the prior action, Merritt swore that he dissolved NAMS I LLC and formed NAMS II LLC because the first company "had not been formed in a way that allowed it to take advantage of the tax benefits" available to such a business. Merritt's own lawyers listed the Operating Agreement among the documents needed "to implement the QOF structures" for his metal, trucking, and vinegar businesses.

35. Nothing in the Operating Agreement shows that the partners meant it to replace their partnership. It does not mention the Partnership Agreement, the Venture Agreement, Gardner's invention, or the patent application. Its integration clause supersedes prior understandings only "with respect to the subject matter of this Agreement." Gardner and Merritt did not sign it in their individual capacities, and Merritt told Gardner it was just a formality. The partners never intended NAMS II LLC to supersede their partnership, and they never agreed to dissolve the partnership or to confine it to NAMS II LLC.

36. Fourth, Gardner's claim for correction of inventorship is within the exclusive jurisdiction of the federal courts, and no federal court sits in Saint Johns County, Florida. The clause requires suit in courts located in Saint Johns County, so the only courts that satisfy it are Florida state courts, which cannot hear that claim.

37. Fifth, the clause is unenforceable because Merritt obtained it by breaching the duties he owed Gardner as his partner. As Gardner's fiduciary, Merritt was required to deal with him openly and to disclose any term that affected his rights. Instead, Merritt had his personal lawyers at Gunster, Yoakley & Stewart, P.A. ("**Gunster**"), draft the Operating Agreement, including a clause sending every dispute to Merritt's home county, while the agreement told its members that Gunster represented only the company. Merritt sent the agreement to Gardner, who had no lawyer and could not afford one, with a one-line instruction to "get it done." He conditioned his funding on Gardner's signature and told Gardner the agreement was just a formality. He never explained the forum clause or any other material term. A clause obtained through a fiduciary's concealment and undue influence is not enforceable.

38. *Prior action.* On May 7, 2025, Gardner and Nacirema sued Merritt, NAMS I LLC, NAMS II LLC, and FirstQOF in the Supreme Court of the State of New York, Suffolk County, Index No. 602731/2025. That action asserted claims under the Venture Agreement and sought a declaration that the Operating Agreement and the Incentive Agreement were void. On August 25, 2025, the court dismissed it under CPLR 3211(a)(1) based on the Operating Agreement's forum-selection clause. The court did not reach the defendants' personal-jurisdiction arguments or the merits. This action reasserts none of those claims. It asserts claims for breach of the Partnership Agreement and of Merritt's fiduciary duties as a partner, claims under New York partnership law, and a claim within this Court's exclusive jurisdiction, none of which was before that court. It seeks no relief under the Operating Agreement or the Incentive Agreement.

## IV. Factual Allegations

### A. Introduction to Steel Manufacturing and Metallurgic Briquettes

39. A steel mill is an industrial facility that produces steel by processing raw materials such as iron ore, coal, and scrap metal through processes like smelting, refining, and rolling to create products like sheets, bars, billets, coils, plate, and beams.

40. These mills often include blast furnaces, electric arc furnaces, foundries, and continuous casting machines to melt and shape the metal efficiently.

41. A briquetting plant is a specialized production unit that compresses loose materials, such as biomass, metal dust, or industrial waste, into dense, uniform briquettes using high pressure, often for easier storage, transport, or use as fuel or feedstock.

42. Briquetting helps in recycling waste by binding particles with or without binders, transforming unusable waste metal that would have been sent to the landfill into a valuable resource.

43. Briquetting plants can support steel mills by processing metallic waste like iron ore fines, steel dust, shot dust, or mill scale into briquettes that serve as steelmaking feedstock used in furnaces, reducing raw material costs, landfill costs, and environmental impact.

44. In electric arc furnaces, briquettes from steel mill byproducts can replace some virgin materials, like scrap metal, HBI, or DRI, improving sustainability.

### B. Gardner Invents a Liquid Metal Binder and Metal Briquetting Process

45. In 2019, Julien Lee, CEO of UK-based Binding Solutions Ltd. ("**BSL UK**"), contacted Gardner because Gardner had over 20 years of experience in mining and metal recycling, direct steel mill contacts, sales, and successful projects in North and South America.

46. BSL UK had a cold bonding technology and was interested in identifying iron ore tailings, steel waste fines, and coal fines located in North and South America.

47. To accomplish this, Gardner and Lee formed a Delaware LLC named BSL Americas, LLC ("**BSLA**") that was co-owned by BSL Projects (a wholly owned subsidiary of BSL UK) and EJS Management LLC (owned by Gardner).

48. BSL UK granted BSLA a license to BSL UK's cold bonding technology and entered into a Sales and Commission Agreement with EJS Management LLC.

49. BSLA's purpose was to secure long-term contracts and license agreements with steel mills and other commodity-producing companies for the reclamation and recycling of certain waste and waste byproducts.

50. Gardner was appointed BSLA's Chief Executive Officer and was responsible for its day-to-day operations.

51. Gardner introduced BSL UK to many potential customers, including Customer 1, Customer 2, Customer 3, Customer 4, Customer 5, Customer 6, Customer 7, Customer 8, and Customer 9.[1]

52. In 2021, Gardner was introduced to Ronnie Kosarik, who owned and operated a company called Skyline Metals LLC ("Skyline Metals"), a slag processing and reclamation company located in Pennsylvania.

53. Under Gardner's management, BSLA purchased a briquette roll press from Supplier 1 and had it installed at Skyline Metals' facility. Gardner negotiated vendor financing from Supplier 1 with a monthly payment plan.

54. Unfortunately, BSL UK could not supply its binder at an economic price or supply it in sufficient quantities to support BSLA's operations and expected volumes.

55. As a result, Gardner began working on a new binder formulation that could be produced in sufficient quantities, at an economical cost, and would meet customers' specifications related to crush strength, chemistry, melt yield, non-deleterious nature, and degradation for the resulting briquettes ("**Gardner's Binder**").

56. Gardner, from his home in New York, on his own behalf, on his own time, and at his own expense, researched binder chemistries, identified and sourced candidate materials from multiple suppliers, arranged for bench testing of numerous resin and binder combinations, and refined the formulation through iterative experimentation.

57. Gardner perfected his formula in 2022 before he met Merritt.

[1] To protect confidential business relationships, Plaintiff identifies customers and suppliers by number. Plaintiff will disclose their identities to Defendants and the Court, under seal, if appropriate.

58. As part of that process, Gardner identified and began working with four key suppliers: Supplier 2, Supplier 3, Supplier 4, and Supplier 5. Those suppliers provided the ingredients for his binder, blended them to Gardner's specifications, and transported the finished binder wherever Gardner needed it.

59. By October 2021, BSLA's business was in jeopardy, as was Gardner's reputation, because without adequate supplies of a binder that worked, BSLA could not remain operational and support the customers' requirements.

60. Gardner resigned from BSLA on November 29, 2021, but agreed to stay on through the end of the year to wind down BSLA's affairs.

61. Kosarik and Gardner decided to take over the payments for the Supplier 1 briquetting equipment from BSLA and formed a new entity called Sky Recycling, LLC ("**Sky Recycling**") to commercialize Gardner's Binder to try to fulfill the promises he had made to the steel mills.

62. Unfortunately, the briquetting line at Skyline Metals experienced significant downtime and required ongoing and expensive maintenance.

63. But Kosarik was unwilling to invest additional money to fix the briquetting line or to acquire new equipment to expand capacity.

### C. Gardner Enters into a Partnership with Merritt to Commercialize His Binder

64. Gardner's contacts at Supplier 1 were aware of his growing frustrations with Kosarik because of ongoing safety issues and the refusal of Kosarik to invest in better equipment.

65. Toward the end of November 2022, Gardner's contacts at Supplier 1 introduced Gardner to a new potential investor named Kevin Merritt.

66. Merritt had recently sold his company, Humic Growth Solutions, Inc., for approximately $84 million and was looking for a new venture.

67. Merritt had no prior experience in steelmaking, metal reclamation, recycling, or briquetting.

68. Gardner pitched his idea for a steel mill beneficial repurposing campus to Merritt via telephone from his home in New York over two consecutive days in November 2022.

69. The first call occurred on or around November 23, 2022, and lasted for about an hour and a half. On that call, Gardner explained the steelmaking industry and the potential for generating hundreds of thousands of dollars per month in revenue by briquetting metal waste and byproducts for steel mills using his binder and briquetting process. During that call, Merritt told Gardner that Kosarik was planning to throw him in the dumpster and that he should ditch Kosarik, and Merritt said that they had to get the liquid binder exclusively under Gardner and Merritt's joint control ASAP.

70. Merritt called Gardner in New York the next day, praised Gardner's business idea, and offered to form a partnership for the purpose of commercializing Gardner's Binder through a metal waste briquetting business targeting steel mills. Merritt pressured Gardner to move quickly, telling him that Gardner could either commit right away or Merritt would need to find something else to invest his capital into.

71. Merritt told Gardner that he believed this business could be even bigger than Humic Growth Solutions.

72. In the discussions that followed by phone, Merritt and Gardner agreed to be equal partners, each owning and controlling half of the business and sharing equally in its profits and losses.

73. Merritt agreed to lend money to get the first plant operational, at 11% interest, and once Merritt's loan was repaid, profits would be shared equally. Merritt always structured his funding as a loan to the company, not as a capital contribution. The money was to be used to acquire real estate to operate, buy equipment, obtain the patent, and grow the business.

74. The partnership was an equal, 50/50 venture. Under their agreement, Gardner would own half of the business, have an equal say in running it, and receive half of its profits or losses, and he would operate the business and expand it. The partners planned to grow it globally, not just in the United States, and discussed placing briquetting machines in Brazil, in Texas, and at Customer 12. To build that business, each partner agreed to make specific contributions.

75. Gardner agreed to contribute (i) his binder formula, briquetting process and dosing sequence, binder supplier list, slag process, and related know-how; (ii) his relationships with potential customers, including multiple customer trials already in progress; and (iii) his full-time efforts managing operations, installing briquetting lines, producing briquettes, and securing customer contracts.

76. Merritt agreed to (i) lend the business the money it needed to start up, to be repaid with 11% interest before the partners shared profits; (ii) handle formation of the partnership's legal entities; (iii) pursue patent protection for Gardner's Binder; (iv) advise Gardner on ending his business relationship with Kosarik and Sky Recycling; and (v) secure the production and exclusive supply of the ingredients needed for Gardner's binder.

77. Merritt also advised and directed Gardner on how to end his relationship with Kosarik. He told Gardner to tell Kosarik that the business was too taxing on Gardner's

family and that Gardner needed out, and to ask Kosarik to buy him out. Merritt told Gardner to get whatever buyout amount he could from Kosarik, but that it did not matter, because Gardner would make more money with Merritt.

78. Merritt expressly conditioned his partnership offer on Gardner's agreement to disclose the binder formula and briquetting process to him in writing, so that Merritt could prepare a patent application to be assigned to an entity owned equally by the two of them.

79. On these terms, in December 2022, Gardner and Merritt entered into an oral agreement (the "**Partnership Agreement**") and formed a partnership to commercialize Gardner's binder formula, and the processes developed to use it, including his slag process, through a metal recycling and briquette business. The partnership had no fixed term, and it has never been dissolved.

80. In December 2022, Gardner and Merritt spoke multiple times every day. Merritt sometimes called and texted Gardner ten to fifteen times a day to discuss the patent, finding equipment, and other business issues.

81. Gardner was not a novice. He had spent more than twenty years in mining and metal recycling, had run BSLA as its chief executive, had negotiated equipment financing and supply agreements, and had built relationships with steel mills across North and South America.

82. What Gardner lacked was the expertise Merritt offered. Merritt had built successful companies, understood corporate governance, had obtained patents, and already had corporate counsel he had worked with before. Gardner entered the partnership because Merritt promised to bring that expertise to their venture.

83. Gardner's prior ventures had taught him how vulnerable he was when a business was not structured fairly. Before agreeing to the partnership, Gardner explicitly told Merritt that he was relying on him to structure their venture fairly, and that reliance became part of their bargain. Merritt assured Gardner that he was trustworthy and that he would never steal Gardner's Binder or his business.

84. Merritt presented himself as a mentor. He told Gardner, "I have done very well in life, almost like Elon Musk, I want to give back, I want to teach you," and said he wanted to help Gardner build a billion-dollar company. Gardner took Merritt at his word and trusted him, as a partner with a fiduciary duty, to look after both of their interests in structuring the business.

85. The partners divided the work as they had agreed. Gardner would build and run the business, and Merritt insisted on handling everything else: the legal entities, corporate matters, and banking. Merritt told Gardner to focus on operations and leave the rest to him. He assured Gardner that the company he was forming would be a 50/50 partnership, and he said that he had a full staff and that all business transactions had to go through his home office at 417 Triple Crown Lane.

86. Gardner trusted Merritt with that side of the business. Merritt had built and sold a company for approximately $84 million, worked with established corporate counsel, and had promised to structure the venture fairly and never take Gardner's Binder. Gardner had no reason to doubt him.

87. But when it came time to form the partnership's entities and pursue patent protection for Gardner's Binder, Merritt used his expertise to defraud Gardner and benefit only himself.

88. The partners went to work immediately, each on his side of the business. Together they began evaluating locations for the partnership's first briquetting plant. Gardner also began negotiating for the binder supply the plant would need, while Merritt began forming various entities for the business.

89. On December 29, 2022, he formed NAMS I LLC, Document No. L23000004415.

90. In the Articles of Organization for NAMS I LLC, Merritt listed himself as its only member, named himself as its registered agent, and used his personal residence in Saint Johns, Florida, as its principal address. Gardner was not listed as a member or manager of NAMS I LLC, despite being an equal partner in the business. Merritt never provided Gardner with a copy of the NAMS I LLC filings.

91. Gardner, at Merritt's request, negotiated an Exclusive Manufacturing Agreement with one of his key suppliers, Supplier 5 (the "**Exclusive Manufacturing Agreement**"), that made Supplier 5 the exclusive manufacturer for NAMS for "all polymer Binders for use specifically in briquette production of metallics fines, Alloy fines and Carbon Fines generated from the steel production sector." Gardner negotiated this deal from his home office in New York.

92. Merritt signed the Exclusive Manufacturing Agreement, dated December 30, 2022, on behalf of the partnership, which was doing business as North American Metallurgic Solutions, LLC ("**NAMS**").

93. The Exclusive Manufacturing Agreement barred Supplier 5 from producing "the Polymer or similar binders specifically for briquetting of Steel By products including carbon fines within the territory of North America" for anyone other than NAMS.

94. In the Exclusive Manufacturing Agreement's "Governing Law and Forum" clause, Merritt on behalf of the partnership agreed that New York law would govern, and that New York would be the exclusive forum for all disputes arising under the agreement.

95. In December 2022, Merritt registered the domain name nametal.com for the venture's website and email accounts.

96. The website included the following "About Us" description in early 2023:

> **About Us**
>
> North American Metallurgic Solutions (NAMS) is a state-of-the-art slag reclamation and Beneficial Repurposing company. NAMS specializes in providing innovative recycling solutions to the steel manufacturing industry.
>
> Our proprietary processing and patent-pending technology diverts waste and by-products that are typically bound for landfills, and beneficially converts and repurposes these materials back into the steel making process.
>
> Our team collectively has over 100 years of experience in material processing, handling, recycling, and agglomeration.
>
> Our new, world-class beneficial repurposing campus, located in Central City, Kentucky, provides process solutions for slags, sludge, fines, and dust. The new facility will enjoy rail service beginning in 2024, allowing for improved, more cost-efficient transport, while reducing the carbon footprint attendant to truck transport.

97. On January 5, 2023, Gardner and Merritt signed a written agreement, prepared by Merritt, titled "Agreement to Create Business Venture" (the "Venture Agreement"). The Venture Agreement had a limited purpose. It provided that the parties would form a Florida limited liability company, owned 50% by each of them, to hold the patent on Gardner's invention. Gardner executed the Venture Agreement in New York.

98. Merritt made the Venture Agreement the condition for starting Gardner's $15,000 monthly draw. He told Gardner that if he signed it, Merritt would get him his $15,000. Merritt knew that Gardner had funded the development of his binder himself, that Kosarik was withholding money he owed Gardner, and that Gardner therefore needed income

quickly in December 2022 and January 2023. Merritt used that need to press Gardner to sign.

99. The Venture Agreement, drafted by Merritt, contains no integration clause and did not restate or replace the Partnership Agreement. It did not address, among other things, the partners' equal ownership of the briquetting business, their equal sharing of its profits and losses, Gardner's management of operations, his customer relationships, or any capital contribution by Merritt beyond advancing legal and patent costs.

100. By the time Gardner signed the Venture Agreement on January 5, 2023, Merritt had already formed NAMS I LLC and made himself its only member. Merritt did not tell Gardner that, even as he signed an agreement promising to form an LLC owned equally by the two of them.

101. On January 9, 2023, Gardner emailed his sales contact at Supplier 3 to tell him that he had left Sky Recycling to go into business with Merritt.

102. On January 10, 2023, Gardner formally ended his relationship with Sky Recycling by selling his membership interest under a Membership Unit Purchase Agreement, as Merritt had advised him to do. Gardner gave up his ownership of Sky Recycling in reliance on Merritt's promise that Gardner would own half of the new venture.

103. From the start, Gardner and Merritt acted as partners and told others they were partners. Merritt never corrected anyone who called Gardner his partner, and he has since admitted the partnership in a court filing.

104. On February 3, 2023, Gardner emailed a potential vendor, with Merritt copied: "You were referred to me by my partner Kevin Merritt regarding the Feed hopper and conveyor." Merritt did not object to being called Gardner's partner.

105. That email was typical. Throughout 2023 and 2024, Gardner and Merritt openly referred to each other as partners in their dealings with employees, vendors, and customers.

106. In the prior action, Merritt described Gardner in a June 9, 2025, court filing as a "disgruntled former business partner of Merritt and independent contractor of NAMS II [LLC]."

107. The partnership Merritt described could not have been NAMS II LLC. Neither Gardner nor Merritt was ever personally a member of that company; its members were FirstQOF LLC and Nacirema Holdings LLC. And in the same sentence, Merritt called Gardner both his "business partner" and, separately, an "independent contractor of NAMS II [LLC]." The partnership he described is the one the two men formed in December 2022.

108. And that partnership was not limited to any one entity. Its purpose was to commercialize Gardner's Binder and the processes developed to use it, including Gardner's slag process, and everything done toward that end was partnership business: manufacturing the binder, building and operating briquetting plants, hauling materials and briquettes, processing slag from steel mills, securing customers, and obtaining and holding the patent. NAMS II LLC is one part of that business.

### D. Merritt Erroneously Lists Himself as an Inventor on the Patent

109. The Venture Agreement placed control of patent prosecution solely in Merritt's hands, providing that:

> 1. Merritt and Gardner will form a Limited Liability Company (LLC) under Florida law to be owned 50% each by Merritt and Gardner to hold said patent, Merritt will advance the legal costs associated with creation of this LLC.
>
> 2. Merritt and Gardner will assign their respective rights in and to the Joint Invention to the newly formed Florida, LLC. Merritt will advance the legal costs associated with the creation of this Assignment.

> 3. Using patent counsel of Merritt's choosing, will apply for world-wide patent protection for the joint invention under the Patent Cooperation Treaty (PCT) naming Merritt and Gardner as joint inventors thereof and designating the United States Patent and Trademark Office (USPTO) as the examining authority. Merritt will advance the costs of evaluating the prospects for and the drafting of documents associated with patenting.
>
> 4. A detailed Operating Agreement for the LLC will be prepared by counsel of Merritt's choosing, which must be signed by both Gardner and Merritt before any patent application on the Joint Invention is applied for. One provision which the Operating Agreement must include is the manner by which Merritt will be reimbursed for advancing the costs for patent protection and advancing the costs for creation of the LLC, including the detailed Operating Agreement.

110. Gardner invented this binder formula before he met Merritt. On January 13, 2023, Gardner sent Merritt, in confidence, a detailed written description of the composition, ingredients, dosing, and production process of Gardner's Binder, along with specification sheets from his key suppliers, so that Merritt could begin preparing the patent application contemplated by the Venture Agreement.

111. On January 31, 2023, Merritt emailed Gardner an engagement letter for Gray Ice, the Kentucky law firm Merritt chose to prosecute the partnership's patent. Gardner signed the engagement letter at his home office in East Northport, New York.



AGREED AND ACCEPTED:

North American Metallurgic Solutions, LLC
St. Augstine, FL

BY: ______________________
KEVIN MERRITT

DATE: 2/9/23

North American Metallurgic Solutions, LLC
Long Island, NY

BY: ______________________
James J. Gardner

DATE: 2/9/2023

112. The engagement letter provided that Gray Ice would represent North American Metallurgic Solutions, LLC "in patent prosecution matters related to a liquid binder for use in metallurgic processes and production of briquettes."

113. On or about February 9, 2023, Merritt drafted a provisional patent application titled "Liquid Binder for Metallurgic and Steel Manufacturing and Method of Briquette Formation," based on the written description Gardner provided on January 13, 2023. Merritt sent the draft to Gardner for review, and Gardner returned his edits.

114. From that point forward, Merritt alone directed the patent prosecution. After Gardner signed the engagement letter, Merritt instructed him not to communicate with Gray Ice. Because the partners had agreed that Merritt would handle the patent, Gardner complied. Apart from the papers he was asked to sign, Gardner never saw any of the filings

made during patent prosecution and was not consulted on them. Gardner relied on his partner, Merritt, to properly prosecute the patent for the benefit of the partnership.

115. On February 14, 2023, Gray Ice, at Merritt's direction, filed U.S. Provisional Patent Application No. 63/484,848 (the "**Provisional Application**"), naming both Gardner and Merritt as inventors.

116. On February 21, 2023, Gardner and Merritt both signed an assignment, drafted by Gray Ice at Merritt's direction, conveying their rights in the invention disclosed in the Provisional Application to North American Metallurgic Solutions, LLC (the "**Assignment**"). Gardner signed because he understood that North American Metallurgic Solutions, LLC was the jointly owned company the Venture Agreement required.

117. Merritt told Gardner to get the Assignment signed immediately or he would not fund the project. Merritt also told Gardner not to worry about the Operating Agreement because it was just a formality.

118. On February 13, 2024, at Merritt's direction, Gray Ice filed U.S. Patent Application No. 18/440,391 (the "**Nonprovisional Application"**), claiming priority to the Provisional Application. Gardner was never informed that this application had been filed.

119. On May 5, 2026, the United States Patent and Trademark Office issued U.S. Patent No. 12,618,018, titled "Liquid Binder for Metallurgic and Steel Manufacturing and Method of Briquette Formation" (the "'018 Patent"). The '018 Patent names Gardner and Merritt as inventors and identifies North American Metallurgic Solutions, LLC as assignee.

120. During prosecution, the examiner considered WO 2022/200770 A1, a patent publication owned by BSL UK, and allowed the '018 Patent over it.

(10) **Patent No.:** **US 12,618,018 B1**
(45) **Date of Patent:** **May 5, 2026**

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2007/0102115 A1* | 5/2007 | Falke | ................. | D06M 15/693<br>152/565 |
| 2024/0093328 A1 | 3/2024 | Joyce et al. | | |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| CN | 109576489 A * | 4/2019 | ............... | C21B 5/00 |
| WO | WO-2019034859 A1 * | 2/2019 | | |
| WO | WO-2022200770 A1 * | 9/2022 | ......... | C21B 13/0066 |

OTHER PUBLICATIONS

English-language machine translation of CN 109576489 A (Year: 2019).*

* cited by examiner

121. By allowing the ’018 Patent over BSL UK’s publication, the USPTO determined that Gardner’s Binder, as claimed, is patentable over BSL UK’s binder.

122. Merritt nonetheless accused Gardner of stealing it. On January 24, 2025, two weeks after Merritt removed Gardner, Merritt’s counsel at Gunster wrote that the formulation “was actually developed by Mr. Gardner’s prior employer, Binding Solutions UK Ltd.,” that the company’s patent counsel had advised that it “was never patentable at all due to prior use,” and that Gardner had “fraudulently induced Mr. Merritt” to invest in it. Gunster asserted that these “recent revelations” might give the company “other grounds” to terminate Gardner for Cause and threatened to seek at least $12.5 million from him.

123. Gunster’s letter confirms whose lawyers they were. The Operating Agreement falsely stated that Gunster represented only NAMS II LLC. Yet Gunster’s letter pressed Merritt’s personal grievance, that Gardner had induced “Mr. Merritt” to invest “millions of dollars,” further demonstrating that Gunster had advised Merritt personally when it prepared the Operating Agreement in February 2023.

124. Merritt repeated the accusation to the court in the prior action. In a memorandum of law filed on June 9, 2025, Merritt asserted that "Gardner stole the formula from his previous employer" and that the patent application "was due to be denied because the formula . . . was never patentable at all."

125. Both assertions were false. The USPTO considered BSL UK's publication and allowed the '018 Patent over it, and the patent is presumed valid. 35 U.S.C. § 282.

126. And while Merritt was calling the formula stolen and unpatentable, NAMS II LLC, under his control, kept prosecuting the application.

127. Merritt has never claimed to have contributed anything to the binder formula. His accusation was that it came from Gardner's former employer, not from Merritt. Neither Gunster's letter nor Merritt's memorandum suggested that Merritt invented any part of it.

128. The '018 Patent has thirteen claims. Claim 1 claims a briquette made from a ferrous or ferro-alloy steel by-product and a binder mixture of polyvinyl alcohol resin, phenolic resin, an ester-based hardener, and water in stated proportions, and a resin powder. Claim 8 claims the binder itself. The dependent claims add a powdered phenolic novolac resin with hexamethylenetetramine (claim 2), dry cellulose matter (claim 3), crush-strength ranges of 80 to 300 psi uncured and 300 to 1,500 psi cured (claims 4 and 5), a cure time (claim 6), a microbicide (claims 7 and 9), sodium hydroxide (claims 10 and 12), and diethanolamine (claims 11 and 13).

129. Merritt contributed nothing to the conception of any of these claims.

130. Gardner had formulated a binder combining polyvinyl alcohol, phenolic resin, an ester-based hardener, resin powder, and cellulose fiber, and had used it to make cold-pressed

briquettes from steel by-products that fell within the claimed industry-standard crush-strength ranges before he met Merritt.

131. The ’018 Patent nonetheless names Merritt as a co-inventor and lists him first. This is an error that requires correction.

### E. MERRITT CREATES ENTITIES HE CONTROLS TO HOLD THE PARTNERSHIP’S ASSETS

132. Before he met Gardner, Merritt owned or operated multiple business entities, including:

(a) North American Trading Group Inc.: this entity was formed on March 10, 2011, and assigned document number F11000001104. Its principal place of business is listed as 113 Barksdale Professional Center, Newark, DE 19711. It is managed by Merritt.

(b) Humic Growth Solutions, Inc.: this entity was formed on December 19, 2013, and assigned document number P13000100589. This is the entity that Merritt sold for approximately $84 million shortly before meeting Gardner.

(c) QOFMEMBER 5 LLC: this entity was originally formed as North American Vinegar Company, LLC on December 2, 2021, and assigned document number L21000511926. The name of the company was changed to QOFMEMBER 5 LLC on March 1, 2023. It is managed by Merritt.

133. Beginning on December 29, 2022, Merritt, working with his personal attorneys at Gunster, built a complex corporate structure to conduct the partnership’s business and hold

its assets. That structure includes at least the following ten Florida limited liability companies:

(a) North American Metallurgic Solutions, LLC ("**NAMS I LLC**"): this entity was formed on December 29, 2022, and assigned document number L23000004415. Its principal place of business is listed as 417 Triple Crown Lane, Saint Johns, FL 32259. It was managed by Merritt until he voluntarily dissolved it on February 17, 2023.

(b) North American Trucking Company, LLC: this entity was formed on February 3, 2023, and assigned document number L23000063107. Its principal place of business is listed as 417 Triple Crown Lane, Saint Johns, FL 32259. It is managed by Merritt.

(c) FirstQOF LLC: this entity was formed on February 8, 2023, and assigned document number L23000060257. Its principal place of business is listed as 417 Triple Crown Lane, Saint Johns, FL 32259. It is managed by Merritt. Upon information and belief, this entity is owned by multiple entities, including a children's trust associated with Merritt, a revocable trust owned by or associated with Merritt, and North American Vinegar Company, LLC or its successor in interest.

(d) SecondQOF LLC: this entity was formed on February 17, 2023, and assigned document number L23000078120. It is managed by Merritt.

(e) North American Metallurgic Solutions, LLC ("**NAMS II LLC**"): this entity was formed on February 17, 2023, and assigned document number

L23000078271. Its principal place of business is listed as 417 Triple Crown Lane, Saint Johns, FL 32259. It is managed by FirstQOF LLC.

(f) 200 W. Dewey St. LLC: this entity was formed as NAMVC QOZB, LLC on March 1, 2023, and assigned document number L23000093957. The name of the company was changed to North American Vinegar Company, LLC on March 3, 2023. The name was changed to 200 W. Dewey St. LLC on July 31, 2024. Its principal place of business is listed as 417 Triple Crown Lane, Saint Johns, FL 32259. It is managed by Merritt.

(g) 605 Cozy Cove Road, LLC: this entity was formed on October 27, 2023, and assigned document number L23000492435. Its principal place of business is listed as 417 Triple Crown Lane, Saint Johns, FL 32259. It is managed by FirstQOF LLC.

(h) 800 S Pemiscot Street LLC: this entity was formed on November 12, 2024, and assigned document number L24000477330. Its principal place of business is listed as 800 S. Pemiscot St., Hayti, MO 63851. It is managed by Merritt.

(i) Nex-Core Metals LLC: this entity was formed on December 30, 2024, and assigned document number L25000002614. Its principal place of business is listed as 9571 Barker Dr., Nabb, IN 47147. It is managed by Merritt.

(j) Bind-Max Solutions LLC: this entity was formed on July 30, 2025, and assigned document number L25000350535. Its principal place of business is listed as 800 S. Pemiscot St., Hayti, MO 63851. It is managed by 800 S Pemiscot Street LLC.

134. Each of these ten entities is owned or controlled by Merritt, either directly or through other entities that Merritt also owns and controls. Upon information and belief, one of more of these entities, including at least FirstQOF LLC, lists persons or entities other than Merritt as members. None of these entities list Gardner as a member.

135. Merritt formed these entities without consulting or informing Gardner. The only LLCs Gardner knew about were NAMS II LLC, which he believed was the company described in the Venture Agreement that he and Merritt co-owned equally, and FirstQOF, which was listed as its manager in the Operating Agreement. Merritt never disclosed the existence of any of the other LLCs, or the overall structure he was building.

136. Merritt used North American Trucking Company, LLC to acquire three trucks that he and Gardner used to haul materials and briquettes for the partnership. When he acquired the trucks, Merritt expressly told Gardner they belonged to the partnership.

**F. Merritt Replaces NAMS I LLC with NAMS II LLC.**

137. On February 17, 2023, Merritt had Gunster file Articles of Dissolution for NAMS I LLC. The same day, Merritt filed a "Consent to Use of Name," through which NAMS I LLC consented to a new entity's use of the name "North American Metallurgic Solutions LLC," and Gunster filed Articles of Organization for that new entity, NAMS II LLC.

138. NAMS II LLC's Articles of Organization limited its purpose to the use of "real estate located in Central City, Kentucky, in such a way that the Company qualifies as a 'qualified opportunity zone business.'" Its manager was FirstQOF, an entity Merritt had formed nine days earlier.

139. Two days later, on February 19, 2023, Gunster emailed Merritt about "critical items pending to start funding the metal and trucking business." Those items included a

draft Operating Agreement for North American Metallurgic Solutions, LLC (the "Operating Agreement") and a draft Incentive Award Agreement (the "Incentive Agreement"). Gunster described the Operating Agreement as one of the documents it was "preparing to implement the QOF structures" for Merritt's metal, trucking, and vinegar businesses.

140. Gunster sent that email to Merritt at northamericantrading@gmail.com, an address tied to his pre-existing business, North American Trading Group Inc., rather than to the venture's nametal.com domain, and copied accountants at BDO. Gunster sent the drafts to Merritt "for your sign-off" and advised him to share them with Gardner afterward, "for his sign-off asap, to confirm he is in alignment before you fund North American Metallurgic."

141. The next morning, February 20, 2023, Merritt forwarded Gunster's email and the drafts to Gardner in New York. His only explanation of the 39-page Operating Agreement was: "Just in last night from Lawyers, please review and let's get it done." Merritt did not tell Gardner that Gunster was his personal counsel. He did not explain any of the agreement's terms, including the clause requiring disputes to be litigated in Saint Johns County, Florida, where Merritt lives. And he did not suggest that Gardner obtain his own counsel.

142. Merritt pressed Gardner to sign quickly so that Merritt could "wire the money." Merritt was to lend the company $15 million. When Gardner asked why he was not on the company's bank account, Merritt said he would add Gardner once his loan was repaid in full with 11% interest. He never did.

143. By this point, the partners were no longer on equal footing. Gardner had sold his only other business and committed his binder formula, his customer relationships, and his full-time efforts to the partnership. He had no other source of income and no practical way

to commercialize his binder elsewhere. If the partnership failed, Gardner would lose everything.

144. Merritt faced no comparable risk. Having recently sold Humic Growth Solutions for approximately $84 million, he was investing a fraction of his wealth. And Merritt controlled the venture's capital, its lawyers, its bank accounts, and the entities through which it would operate.

145. Gardner could not afford a lawyer of his own. Under the partners' agreement, Merritt had taken responsibility for forming the venture's entities, and Gardner trusted his partner to do so honestly and fairly. Neither Gardner nor Nacirema retained counsel to review the Operating Agreement.

146. On February 21, 2023, the day after Merritt sent him the drafts, Gardner signed the Assignment.

147. On February 23, 2023, Merritt, as FirstQOF's manager, changed NAMS II LLC's name to NAMS QOZB LLC. On February 28, 2023, he changed it back to North American Metallurgic Solutions, LLC.

**G. THE OPERATING AGREEMENT AND THE INCENTIVE AGREEMENT.**

148. On or about February 28, 2023, Merritt signed the Operating Agreement on behalf of FirstQOF, and Gardner signed it on behalf of Nacirema.

149. On its face, the Operating Agreement appeared to give Gardner what Merritt had promised. It named FirstQOF and Nacirema as members. Its Exhibit A listed each as holding a 50% Percentage Interest and stated that these interests "reflect fully vested Percentage Interest." It provided that profits and losses would be shared in proportion to those interests. And it treated the company as a partnership for federal tax purposes.

150. However, upon information and belief, FirstQOF is an entity owned by members other than Merritt. Moreover, other terms gave Merritt control. The company was "manager managed," with FirstQOF as its initial manager, and FirstQOF, and therefore Merritt and other potential members of FirstQOF, had sole control over "[a]ll uninvested funds" of the company and its bank accounts. FirstQOF received 500,000 Class A Voting Membership Units, and Nacirema received 500,000 Class B Non-Voting Membership Units. FirstQOF's capital account was listed at $15,000,000, even though Merritt had not yet contributed any funds, and Nacirema's at zero. The agreement recited February 17, 2023, as the company's formation date and stated the same narrow Central City purpose as the Articles of Organization.

151. The Operating Agreement also designated Merritt as the company's "partnership representative," with sole authority to act for the company before the Internal Revenue Service and to bind its owners. That designation applies only to an entity with two or more owners; a company with a single owner has no partnership representative. Gardner had no right to participate in Merritt's dealings with the IRS or to be told of them.

152. Merritt alone set the capital balances and decided that Nacirema's units would be non-voting. Neither Merritt nor Gunster consulted Gardner about these terms, and Merritt never explained the capital balances. He told Gardner only that, as long as he was providing the money, he had to be in control, and that once he was paid back, Gardner would get equal voting rights.

153. Section 11.1 of the Operating Agreement stated that Gunster "represents the Company in connection with this Agreement" and "does not represent any Member." It did

not disclose that Gunster also represented Merritt personally. Section 11.19 recited that each party "has been advised by its own counsel." That was not true of Nacirema.

154. The same day, Merritt and Gardner signed the Incentive Agreement. Merritt signed for North American Metallurgic Solutions, LLC through its manager, FirstQOF, and Gardner signed as Nacirema's managing member. The Incentive Agreement purported to grant Nacirema the 500,000 Class B units, with a "threshold value" totaling $15,000,000, subject to a vesting schedule: 250,000 units would vest on February 28, 2024, and the remaining 250,000 "in equal monthly installments over a thirty-six (36) month period beginning on February 28, 2025."

155. The Incentive Agreement also provided that if Nacirema's "employment" with the company was terminated for Cause, "all of the Class B Units (vested or unvested) will be immediately canceled and forfeited without consideration."

156. Merritt told Gardner that the Incentive Agreement was meant to keep Gardner committed to the project for the long haul, because Merritt needed him to operate the company. Merritt described the vesting schedule as a restriction on Gardner's ability to sell his interest, not a limit on his ownership, and assured Gardner that he owned 50% of the company. Gardner relied on his partner's explanation.

157. Taken together, these documents turned the equal, fully vested 50% interest Merritt had promised into non-voting units that would not fully vest for years, could be forfeited at Merritt's discretion, and would share only in company value above Merritt's $15,000,000 threshold plus interest.

## H. Gardner's Partnership Draw and Merritt's Reporting.

158. Beginning on or about March 10, 2023, Gardner received a $15,000 monthly draw against his share of the partnership's profits, paid to his company, Nacirema. Both Gardner and Merritt himself referred to these payments as Gardner's "draw," as shown by the texts below sent on January 6, 2025:




159. Merritt alone decided how to structure the draw. He chose to pay it to Nacirema and had NAMS II LLC report it as "nonemployee compensation" on Forms 1099-NEC for both 2023 and 2024, and he never explained those choices to Gardner. Neither Gardner nor Nacirema ever signed an independent-contractor agreement, an employment agreement, or any other services agreement with NAMS II LLC or any other Merritt-controlled entity.

160. On March 30, 2023, Merritt filed a Certificate of Authority for North American Metallurgic Solutions LLC to transact business in Kentucky (Organization No. 1271503). The Certificate listed the company's date of organization as December 29, 2022, the date NAMS I LLC was formed, and named Gardner as the company's registered agent. Merritt did not replace Gardner as registered agent until February 10, 2025.

161. On February 28, 2024, the day Gardner's first units were scheduled to vest, Merritt pressured Gardner into signing an Amendment to Incentive Award Agreement (the

"Amended Incentive Agreement"). It cut Nacirema's grant by 20%, from 500,000 to 400,000 Class B non-voting units, while stating that the award reflected "an overall threshold value of $15,000,000." It provided that 260,000 units would vest immediately and the remaining 140,000 on February 28, 2025.

162. To induce Gardner to accept the reduction, Merritt promised to increase his monthly draw, but never did. The accelerated vesting Merritt offered also proved illusory, as alleged below.

163. The next day, February 29, 2024, Kyle Murray, NAMS II LLC's controller, sent Gardner an IRS Form 1099 reporting the 2023 payments. When Gardner asked whether he would also receive a Schedule K-1, Murray replied: "You will get a K1 but it will show 0. Our CPA said you can file without it as you didn't become a shareholder until 2024, not 2023." When Gardner responded that he expected to owe significant taxes on his share of the company's income, Murray wrote on March 1, 2024: "Haha potentially in a couple years, for the most part we will show losses for the next few years with machinery depreciation and losses, even if we are making money. I wouldn't be worried about k1 losses just yet."

164. Although NAMS II LLC's own controller acknowledged that Gardner was an owner, Merritt never treated him as one. Neither Gardner nor Nacirema ever received a Schedule K-1 from NAMS II LLC or any other entity. On information and belief, Merritt did not report Nacirema to the IRS as an owner of NAMS II LLC for 2024, consistent with his representation to the State of Indiana that the company was a "single member LLC."

165. On information and belief, Merritt used his control over financial reporting to ensure that Gardner would never receive his share of the partnership's profits. Apart from his monthly draw, Gardner never received any distribution of profits.

### I. Merritt Hides the Partnership's Business in Entities He Alone Controls.

166. The Operating Agreement, the Incentive Agreement, and the Amended Incentive Agreement were part of a broader structure that Merritt designed with his own lawyers, without Gardner's knowledge, to ensure that Gardner was never his equal partner. Merritt's plan was in motion from the partnership's inception, and it placed the partnership's business and assets in entities Merritt alone owned and controlled.

167. NAMS II LLC was only one piece of that structure. Its Central City purpose was far narrower than the partnership's, which was to commercialize Gardner's invention wherever it could be sold. And although its Articles contemplate that NAMS II LLC may operate through "one or more subsidiaries," Merritt placed none of the partnership's other businesses under it. North American Trucking Company, LLC holds the trucks that haul the partnership's materials and briquettes, a service the partnership bills to its customers. 800 S Pemiscot Street LLC holds the Hayti, Missouri facility. On information and belief, Nex-Core Metals LLC and Bind-Max Solutions LLC were formed to conduct partnership business in Indiana and Missouri.

168. Merritt also controlled every source of information about that structure. He alone communicated with Gunster, which formed the entities, and with Gray Ice, which prosecuted the patent. He and Kyle Murray, his longtime employee, controlled the partnership's finances, bank accounts, books, and taxes. Gardner never had access to any bank account or financial record of any of these entities and never received any financial or

tax information about them. He had no way to know where the partnership's revenue went, which entities held its assets, or how its income, losses, and ownership were being reported.

169. Merritt knew Gardner depended on him, and their dealings were never at arm's length. When Merritt presented the Operating Agreement, the Incentive Agreement, and the Amended Incentive Agreement, Gardner was in no position to refuse terms set by the partner who controlled the venture's money, and he relied on Merritt to treat him honestly and fairly.

170. On information and belief, Merritt created that dependence by design. He advised Gardner to sell his interest in Sky Recycling, Gardner's only other business, five days after signing the Venture Agreement and twelve days after forming NAMS I LLC with himself as its only member. He then closed off Gardner's alternatives. The Exclusive Manufacturing Agreement, which Merritt signed on behalf of North American Metallurgic Solutions, LLC, barred Gardner's own supplier, Supplier 5, from producing the binder for anyone else in North America. The Assignment transferred Gardner's rights in his invention to an entity Merritt controlled. And the Incentive Agreement made Gardner's interest non-voting, subject to a multi-year vesting schedule, and forfeitable on termination "for Cause," a determination Merritt alone would make. Each step left Gardner more dependent on Merritt.

### J. NAMS II LLC Operates Within the Partnership, Not in Place of It.

171. Neither Gardner nor Merritt intended the formation of NAMS II LLC, the Operating Agreement, or the Incentive Agreement to terminate, replace, or modify the Partnership Agreement. The Operating Agreement does not mention the Partnership Agreement, Gardner's invention, or the patent application. Gardner and Merritt did not

sign it in their individual capacities. Merritt told Gardner that it was just a formality. And the partners never agreed to dissolve the partnership or to confine it to NAMS II LLC.

172. The partners' conduct after February 28, 2023, confirms that the partnership continued. Merritt kept conducting partnership business outside NAMS II LLC, through North American Trucking Company, LLC, 800 S Pemiscot Street LLC, and other entities he formed. Gardner and Merritt kept referring to each other as partners in their dealings with employees, vendors, and customers. And Merritt's January 3, 2025, letter described their roles by reference to "the original terms," under which he would provide the capital and Gardner would run operations.

173. Gardner's rights as a partner therefore extend to the entire partnership, not merely the interest his entity held in NAMS II LLC.

**K. GARDNER BUILT THE PARTNERSHIP INTO A PROFITABLE BUSINESS.**

174. On or about January 7, 2023, at Merritt's request, Gardner traveled from New York to Central City, Kentucky, to evaluate an industrial property (the "Central City Property") as the site of the partnership's first briquetting plant. Gardner concluded that it was well suited for the plant.

175. Merritt then negotiated the purchase of the Central City Property for $2 million, half payable at closing and the balance one year later. On or about January 8, 2023, three days after signing the Venture Agreement, Merritt signed the purchase agreement as "President" of "North American Metallurgic Solutions, LLC," the name under which the partnership did business. The purchase closed on March 24, 2023.

176. On January 11, 2023, Gardner signed a customer account agreement with Supplier 4, a key raw-materials supplier, on behalf of North American Metallurgic Solutions LLC. The agreement identifies Gardner and Merritt as co-owners.

177. Until Merritt removed him in January 2025, Gardner devoted himself full-time to the partnership. Through September 2023, that meant designing, procuring, and building the partnership's first briquetting facility, in Central City, Kentucky (the "**Central City Plant**"). He constantly traveled between New York and Central City and worked long hours on site with a single goal: getting the plant producing briquettes and generating revenue for the partnership as quickly as possible.

178. That was the division of work the partners intended. But while Gardner built the business, Merritt used his side of the work, forming the entities and pursuing the patent, to build a structure designed to cut Gardner out.

179. Gardner delivered. By September 2023, about eight months after work began, the Central City Plant was fully operational and producing briquettes. In Gardner's experience, bringing a plant like it online ordinarily takes a year or more.

180. With the plant running, Gardner turned to converting production into revenue by winning major steel mill customers.

**L. THE PARTNERSHIP EXPANDS AND BECOMES EXTREMELY PROFITABLE**

181. In or about September 2023, the partnership acquired a second property, at 9727 S. Barker Drive, Nabb, Indiana 47147, to build two new plants. The plants were needed to fulfill an open-ended purchase order for Prime CBI briquettes[2] that Gardner had secured from Customer 13 for its Pittsboro, Indiana facility. The Indiana plants were operational by

[2] Gardner developed and named the Prime CBI Briquette before he met Merritt.

July 2024, with two briquetting lines made up largely of new equipment purchased by the partnership. Mac McClroy again installed the lines, assisted by ten others Merritt hired who had also previously worked for him.

182. The Indiana plant was supposed to be the partnership's flagship, with better and newer equipment. Merritt was especially invested in it and wanted it to produce 10,000 tons of briquettes per month. In the fall of 2023, Merritt called Gardner and directed him not to go to the Indiana plant anymore.

183. On September 13, 2023, North American Metallurgic Solutions LLC filed a foreign registration statement with the State of Indiana (Business ID 202309131724522), listing Merritt as registered agent and president and the company's formation date as February 17, 2023. To the question "Is the LLC a single member LLC?," Merritt answered "Yes."

184. Throughout 2023 and 2024, Gardner conducted trials for multiple potential customers, which required long hours in the lab at Central City creating custom binder formulations optimized for each potential customer based on its fines. He also worked continually with Supplier 5 to improve the binder and reduce its cost.

185. Gardner had also created a process to recover the metallic value from byproducts generated by slag processing, which is one of the key components of the CBI briquette. Gardner, exercising his authority to hire for the partnership, hired Dave Chapman, a former executive vice president of Phoenix Global, in connection with the CBI briquette.

186. On May 11, 2023, Gardner organized a trial at Central City using carbon steel fines, or slag, from Customer 13. Merritt later took the process flow sheet designed by Gardner and then bought and installed the exact same plant and equipment setup at the Indiana facility.

187. By early 2024, Gardner had spent nearly a year producing briquettes for Customer 14 under a developmental program to optimize its briquette production, including by creating a custom binder formulation for Customer 14.

188. In January 2024, Gardner met with Customer 14 to discuss a toll services agreement for Customer 14's remelt briquettes.

189. Gardner had started talking to Customer 14 in December 2022. After a smelting facility in Pennsylvania exploded, Customer 14 urgently needed the partnership's briquettes.

190. Between January 2024 and August 2024, Gardner worked on perfecting the briquettes, and the partnership's production during that period was not enough to keep up with demand. Customer 14 could buy no more than 3,000 tons of briquettes per month. Customer 1 was another potential customer, at up to 50,000 tons per month.

191. By the summer of 2024, Customer 14 was ready to discuss a long-term contract after several months of purchasing briquettes produced at Central City. Merritt insisted on a signed contract before he would invest the money needed to expand the Central City Plant's capacity to meet Customer 14's expected volume.

192. At the end of August 2024, Gardner negotiated a five-year Toll Services Agreement (the "Customer 14 Agreement") with Customer 14. Merritt signed it on behalf of North American Metallurgic Solutions LLC but refused to give Gardner a copy of the final executed agreement.

193. The partnership became extremely profitable at this point. On information and belief, in 2025 the Central City Plant generated approximately $7.8 million in revenue and the Indiana plant approximately $3.1 million, for total revenue of approximately $10.9 million and EBITDA of approximately $7.7 million.

194. On information and belief, sometime after January 2025, Merritt acquired and built out a third production facility, at 800 S. Pemiscot Street, Hayti, Missouri 63851, which further increased the partnership's revenue and profits. On information and belief, this facility has the equipment necessary for Merritt to blend and produce Gardner's Binder himself, further reducing the partnership's costs and increasing profitability, an idea Gardner proposed to Merritt in 2023.

195. On information and belief, the partnership's earnings have continued to increase substantially in 2026.

## M. Merritt Forces Gardner Out and Claims He Owns Nothing

196. Nearly every key person the partnership hired was Merritt's friend, family member, or former employee:

(a) From the partnership's inception, its finances were handled by Kyle Murray, a controller who already managed the finances of Merritt's other business ventures.

(b) In January 2023, Merritt hired his daughter, Kristen Merritt.

(c) In February 2023, he hired his friend Mac McClroy, a contract fabricator and welder, to install the briquetting plant at Central City.

(d) In March 2023, he hired Emilio Rodriguez, a former Humic Growth employee, as the Central City Plant's safety coordinator.

(e) In October 2023, he hired Kevin McHugh, another former employee, as the partnership's engineer.

(f) In December 2024, he hired Josh Wiinamaki, yet another former Humic Growth employee, to run operations.

197. Gardner had no reason to question those hires at the time; an investor staffing a new business with people he trusts is ordinary. Only after Merritt forced him out did their purpose become clear. On information and belief, Merritt placed them in the business so they could learn from Gardner everything needed to run it without him.

198. Wiinamaki, who had been Humic Growth's chief operating officer, was the final piece. Gardner had been the partnership's Executive Vice President since its formation, the role the partners had agreed he would fill. Less than a month after Wiinamaki was hired, without Gardner ever being informed, Merritt disabled Gardner's email account, disabled Gardner's access to company surveillance cameras, and cut him out of the business.

199. Merritt pursued the same goal. Until the Customer 14 Agreement was signed in August 2024, Merritt called, texted, and emailed Gardner multiple times a day with questions about the binder, the briquetting process, daily yields, and Gardner's customer contacts.

200. Once the Customer 14 Agreement secured the partnership's largest customer for five years, Merritt stopped communicating with Gardner directly and spoke to him only through other employees. By then, Merritt and the employees he had placed around Gardner had learned what they needed from him, so Merritt no longer needed Gardner.

201. On January 2, 2025, without warning, Merritt disabled Gardner's nametal.com email account, cutting Gardner off from the partnership's communications, surveillance cameras, employees, day-to-day operations, customers, and records. Merritt then dishonestly told all the partnership's employees that Gardner had resigned to pursue another opportunity.

202. The next day, January 3, 2025, Merritt sent Nacirema a letter titled "Termination of Agreement and Proposed Settlement." In it, Merritt acknowledged that under "the original terms," he had "committed to providing the capital, establishing the company, and building production lines." He then accused Gardner of disengagement and "unauthorized side ventures," and proposed that Gardner accept a fixed period of severance, agree to two years of non-compete, non-solicitation, and non-disparagement restrictions, and surrender his Class B Units:

> As per the original terms, I committed to providing the capital, establishing the company, and building production lines with the understanding that you would subsequently take over operational responsibilities. Unfortunately, I find myself performing both my role and yours, which was never part of our agreement.
>
> Additionally, your disengagement from the company and involvement in unauthorized side ventures constitute clear violations of the operating agreement and your Class B Member Award Agreement. Based on advice from NAMS' legal counsel, NAMS may pursue your immediate termination without compensation.
>
> There are many issues that have led us to this point. Your visits to Central City, Kentucky, which involve spending one or two days on the ground before returning home, have become an unjustified expense for NAMS. Also, at Central City you arranged for materials to be bought in for process with no follow-up, no environmental considerations or accountability whatsoever and now when asked to clean up the mess that you created, you do not have the time to pay attention. Furthermore, your claims of successes with the production of alumina and carbon briquettes do not align with the actual results, because these products fail to meet acceptable standards. Your retention of all laboratory production sheets in your private binder is unacceptable, as these materials are the sole and exclusive property of NAMS. These materials must be immediately returned to the Company.
>
> It is also clear that our professional relationship has deteriorated. Although you may not appreciate my management style, I find your approach disruptive and unsustainable for NAMS. Continuing under these circumstances is not viable.

> In the interest of cooperation, I propose we work toward a mutually agreeable resolution. While immediate termination is warranted, I am willing to negotiate a compensation package to provide you with time to focus on your other ventures, such as Columbian Coke barges in West Virginia and nitrile glove recycling.
>
> The resolution would involve us entering into a severance agreement whereby NAMS will pay you severance for a fixed period in exchange for your compliance with certain restrictive covenants (non-compete, non-solicitation, and non-disparagement) for a two-year period. In addition, your Class B Units in NAMS will be canceled.
>
> If we cannot come to terms on a severance arrangement, then NAMS will proceed with your termination. NAMS would retain all rights to pursue aggressively any claims against you in connection with your interference with NAMS business.

203. Merritt's accusations were pretextual. Gardner's visits to Central City were essential to operating the plant and formulating custom binders for several potential customers; his binder trials had succeeded; and the laboratory production sheets were Gardner's own working records of his formulations that he was continuously working on.

204. On Saturday, January 4, 2025, Merritt called Gardner and asked him to put together a buyout number. After that call, Gardner texted Merritt, "I spoke to my Guy and he will back me to buy your shares if you are interested I would need all paid in capital by you and the financial statements."

205. On January 6, 2025, Merritt texted Gardner back, stating that "NAMS is not for sale Please cease and desist discussing it and or offering NAMS for sale to anyone. I am fully engaged on a daily basis, working through issues at NAMS I do not have the bandwidth for this now."

206. On January 8, 2025, Gunster sent a letter by certified mail to Gardner's home in New York, addressed to Gardner and Nacirema, titled "Termination for Cause." It cited a

new reason, alleged "unauthorized charges" on the company credit card, and declared all of Gardner's vested and unvested Class B Units cancelled and forfeited. The letter stated:

> The Gunster law firm represents North American Metallurgic Solutions, LLC.
>
> This is to notify you that North American Metallurgic Solutions, LLC (the "Company") is terminating your services, as well as the services of Nacirema Holdings LLC, effective immediately. Based on its discovery of your unauthorized charges on the Company's corporate credit card, the Company is no longer interested in negotiating a mutually agreeable exit for your services. The Company has determined that your termination is for Cause, and accordingly, all your vested and unvested Class B Units are hereby cancelled and forfeited.
>
> You must immediately return all materials, documents, and property belonging to the Company that are in your possession.
>
> The Company reserves the right to enforce all continuing obligations pursuant to the Operating Agreement and Award Agreement. Please govern yourself accordingly.

207. The charges Gunster's letter referenced were in fact a single charge of $2,120.99 for a rental car Gardner used from November 2, 2024, to January 3, 2025, while his own car was being repaired after an accident. The rental was charged to Gardner's corporate card by mistake.

208. On January 6, 2025, Merritt texted Gardner the rental invoice. Gardner immediately explained that the "enterprise invoice should have been charged to my card. It must have defaulted as it was a NAMS business account I established." He offered to "fix it or just adjust my invoice for January and deduct it." Merritt refused, replying: "You are no longer working with NAMS = no draw."

209. Two days later, Gunster's letter declared that the company had terminated Gardner for Cause "[b]ased on its discovery of your unauthorized charges." There was nothing to discover. Merritt had known about the charge for two days, had received Gardner's

explanation, and had rejected his offer to repay it. And Merritt had already decided to remove Gardner, as his January 3 letter and his January 6 text ("You are no longer working with NAMS") show, before he ever invoked "Cause." The accidental $2,120.99 charge was not the reason for the termination. It was a pretext Merritt used to claim Nacirema had forfeited its Class B Units in NAMS II LLC.

210. The "Termination for Cause" was also impossible on its own terms. Nacirema is a limited liability company, not a person, and it was never anyone's employee. It had no employment agreement, and NAMS II LLC itself reported every payment it made to Nacirema as "nonemployee compensation." There was no "employment" to terminate, for Cause or otherwise.

211. Gardner had no employment or services agreement with the company either, and he was not a party to the Incentive Agreement, which he signed only as Nacirema's managing member. Gunster's letter nonetheless purported to terminate "your services, as well as the services of Nacirema Holdings LLC," and on that basis alone declared Nacirema's units forfeited, including the 260,000 units that had already vested in February 2024.

212. Nor can a member be fired. Under the Operating Agreement, Nacirema was a Member holding what Exhibit A described as a "fully vested" 50% Percentage Interest. The Operating Agreement contains no provision for expelling a Member and recites the Members' "mutual expectation that all Members will continue as Members." Its only provision for removing an individual Member applies after a bankruptcy, insolvency, or similar "Defaulting Event," and even then requires the company to buy the Member's interest at fair market value. No such event occurred, and Merritt paid nothing. Instead, he

invoked an employment relationship that never existed so that he could declare it terminated and keep Nacirema's interest for himself.

213. The timing of Gardner's termination was no accident. Gardner's remaining 140,000 Class B Units were scheduled to vest on February 28, 2025, less than two months later.

214. Since January 2025, Gardner has been excluded from the partnership's business entirely. On information and belief, Merritt has continued to operate the partnership and keep all profits for himself.

## V. Causes of Action

### A. First Cause of Action - Declaratory Judgment that Gardner and Merritt are Partners (28 U.S.C. § 2201; N.Y. P'ship Law § 10)

215. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

216. An actual and justiciable controversy exists. Gardner contends that he and Merritt formed a partnership in December 2022 and that he owns half of it. Merritt contends that Gardner was an independent contractor whose interest has been forfeited, and he has unlawfully excluded Gardner from the business since January 2025.

217. Under New York law, a partnership is "an association of two or more persons to carry on as co-owners a business for profit." N.Y. P'ship Law § 10(1). Gardner and Merritt formed such an association.

218. *Intent.* Gardner and Merritt intended to be partners. They orally agreed to be equal partners, each owning half of the business, in December 2022. Merritt signed the Venture Agreement promising a company "owned 50% each by Merritt and Gardner." They referred to each other as partners in dealings with employees, vendors, and customers, and a supplier

account form identified them as co-owners. Merritt's January 3, 2025, letter acknowledged "the original terms" under which he would provide capital and Gardner would run operations. On January 4, 2025, Merritt asked Gardner for a buyout number. And on June 9, 2025, Merritt described Gardner to a court as his "former business partner."

219. *Sharing of profits and losses.* Gardner and Merritt agreed to share the profits and losses of the business equally. The Operating Agreement Merritt's counsel prepared for NAMS II LLC provided that profits and losses would be shared in proportion to the members' equal 50% interests. Gardner received a monthly draw paid to his bank in New York against his share of the profits. The receipt of a share of the profits of a business is prima facie evidence of partnership. N.Y. P'ship Law § 11(4).

220. *Joint control.* Gardner and Merritt jointly controlled the business by dividing its management between them. Gardner selected the site for the first plant, designed and built the Central City and Indiana plants, developed the binder formulations, negotiated the business's supplier and customer contracts, and hired personnel for the business. Merritt handled capital, entity formation, patent prosecution, bank accounts, and tax filings.

221. *Contributions*. Each partner contributed to the business. Gardner contributed (i) Gardner's Binder, his slag process, his briquetting process and dosing sequence, and related know-how; (ii) his customer relationships, including customer trials already in progress, and his supplier relationships, including with Supplier 5; and (iii) his full-time efforts managing operations, building and running the partnership's plants, and securing customer contracts. Merritt contributed (i) financing for the business, structured as loans to be repaid with 11% interest; (ii) the formation of the partnership's entities and the handling of its corporate, banking, and tax matters; and (iii) the pursuit of patent protection for Gardner's Binder.

222. *Scope.* The partnership was formed to commercialize Gardner's Binder, and it is not limited to NAMS II LLC. Neither Gardner nor Merritt was ever personally a member of NAMS II LLC, and Merritt himself has described Gardner as his business partner and an "independent contractor of NAMS II [LLC]." The partnership's business has been conducted through NAMS II LLC and the other entities identified in Section IV(E), and the assets those entities hold were acquired on account of the partnership and are partnership property. N.Y. P'ship Law § 12. The formation of NAMS II LLC and the execution of the Operating Agreement did not terminate, replace, or limit the partnership.

223. Gardner is entitled to a judgment declaring that:

(a) Gardner and Merritt formed a partnership in December 2022 to commercialize Gardner's Binder;

(b) Gardner owns a fifty-percent interest in that partnership;

(c) the business conducted through the entities identified in Section IV(E), and the assets of that business, including the '018 Patent, are partnership property; and

(d) Merritt's unlawful purported termination of Gardner in January 2025 did not extinguish Gardner's interest in the partnership. Under New York law, a partner may be expelled only in accordance with a power conferred by the partnership agreement, N.Y. P'ship Law § 62(1)(d), and the Partnership Agreement conferred no such power.

### B. SECOND CAUSE OF ACTION - BREACH OF ORAL PARTNERSHIP AGREEMENT

224. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

225. *The agreement*. In December 2022, Gardner and Merritt entered into the Partnership Agreement, a valid and enforceable oral agreement supported by mutual promises. Under it, they agreed to commercialize Gardner's binder formula and slag process through a metal recycling and briquette business, as equal partners and with no fixed term, on these terms:

(a) each partner would own half of the business, in whatever form it was carried on, have an equal say in running it, and share equally in its profits and losses;

(b) Merritt would lend the business the money it needed to start up, to be repaid with 11% interest before the partners shared profits;

(c) Gardner would contribute his binder formula, briquetting process and dosing sequence, binder supplier list, and related know-how; his customer relationships, including customer trials already in progress; and his full-time efforts managing operations, installing briquetting lines, producing briquettes, and securing customer contracts;

(d) Merritt would form the partnership's legal entities, pursue patent protection for Gardner's Binder, and secure the production and exclusive supply of the liquid binder;

(e) the patent application would be assigned to a company owned equally by the two partners; and

(f) Merritt would structure the venture fairly and provide Gardner with financial statements and a full report every quarter.

226. Merritt has repeatedly acknowledged the Partnership Agreement. He signed the Venture Agreement promising a company "owned 50% each by Merritt and Gardner." His

January 3, 2025, letter referred to "the original terms" under which he would provide capital and Gardner would run operations. And on June 9, 2025, he described Gardner to a court as his "former business partner."

227. *Gardner's performance.* Gardner fully performed. He disclosed Gardner's Binder and his process to Merritt, assigned his rights in the invention as Merritt directed, and gave up his interest in Sky Recycling to devote himself to the partnership. He selected the site for the first plant, designed and built the Central City Plant and the Indiana plant, developed the binder formulations those plants use, and negotiated the supplier and customer contracts on which the business depends, including the Customer 14 Agreement. He worked full time for the partnership from January 2023 until Merritt removed him in January 2025.

228. *Merritt's breaches.* Merritt breached the Partnership Agreement in at least the following ways:

(a) Merritt did not give Gardner half of the business. He organized it so that he alone held every voting interest and controlled every entity, while the only interest allotted to Gardner's side was a non-voting interest in NAMS II LLC that Merritt made subject to vesting and forfeiture.

(b) Merritt formed at least nine other entities to hold the partnership's property and conduct its business, kept their existence from Gardner, and gave Gardner no interest in any of them.

(c) Merritt never paid Gardner his share of the partnership's profits. He limited Gardner to a fixed monthly draw, reported those payments as compensation to a contractor, and kept the partnership's books so that no profits were ever allocated or distributed to Gardner.

(d) In February 2024, Merritt used his control to cut the interest allotted to Gardner's entity in NAMS II LLC by one-fifth.

(e) In January 2025, Merritt removed Gardner from the business. He disabled Gardner's email, stopped his draw, declared him terminated for "Cause," and announced that Gardner's entire interest was forfeited.

(f) Since removing Gardner, Merritt has kept the whole of the business for himself. He has continued to operate the plants Gardner built, perform the contracts Gardner negotiated, and exploit Gardner's Binder and the '018 Patent, and he has formed new entities to expand the business, all without accounting to Gardner or paying him anything for his half.

(g) Merritt has refused Gardner access to the partnership's books and records.

229. *Damages.* Merritt's breaches have deprived Gardner of the benefit of his bargain: a one-half interest in the partnership and its business, his share of the profits the business has earned since December 2022, and his share of the profits it continues to earn from the assets and contracts he created. Gardner has been damaged in an amount to be determined at trial, which he believes to be no less than one-half of the value of the business, together with pre-judgment interest.

**C. THIRD CAUSE OF ACTION - DISSOLUTION AND VALUE OF GARDNER'S INTEREST (N.Y. P'SHIP LAW §§ 62, 63, 69, 73, 74)**

230. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

231. *The partnership and its property.* Gardner and Merritt formed a partnership in December 2022 in which each holds an equal interest. The partnership's business has been carried on through NAMS II LLC and the other entities Merritt formed. The property those

entities hold was brought into the partnership or acquired on its account, and it is partnership property. N.Y. P'ship Law § 12. That property includes, without limitation, all assets of every kind, wherever located and whether now owned or later acquired, that were brought into the partnership, acquired with partnership funds or on the partnership's account, or derived from the partnership's business, including: the '018 Patent and all related applications, continuations, and foreign counterparts; all other intellectual property, including trade secrets, formulations, know-how, trademarks, and domain names; the partnership's customer, supplier, and other contracts and contract rights; real property, buildings, and fixtures; equipment, vehicles, and machinery; inventory; accounts and receivables; cash, bank accounts, and other deposits; goodwill and going-concern value; and all equity and other ownership interests in any entity that holds any such asset, together with all proceeds, products, and profits of any of the foregoing.

232. *Dissolution.* The partnership had no fixed term. In January 2025, Merritt removed Gardner from the business. He disabled Gardner's email, stopped his draw, barred him from the plants he had built, and announced that Gardner's interest was forfeited. By excluding Gardner from carrying on the partnership's business, Merritt dissolved the partnership. N.Y. P'ship Law §§ 60, 62.

233. In the alternative, to the extent the partnership has not already been dissolved, Gardner is entitled to a decree dissolving it. Merritt has willfully and persistently breached the Partnership Agreement, has conducted himself so that it is not reasonably practicable to carry on the business in partnership with him, and has created circumstances that render dissolution equitable. N.Y. P'ship Law § 63(1)(d), (f).

234. *Merritt has not wound up the partnership.* Dissolution did not end the partnership. It continues until its affairs are wound up. N.Y. P'ship Law § 61. Merritt has never wound up the partnership's affairs, settled its accounts, or paid Gardner anything for his interest. Instead, he has continued the business for his own benefit, using the partnership's plants, contracts, and patent, and he has kept all of its profits.

235. *Gardner's rights on dissolution.* Gardner is entitled to have the partnership's property applied to discharge its liabilities and the surplus applied to pay in cash the net amount owing to each partner. N.Y. P'ship Law § 69(1). He is entitled to an account of his interest as of the date of dissolution. N.Y. P'ship Law § 74. And because Merritt has continued the business without any settlement of accounts, Gardner is entitled to have the value of his interest at the date of dissolution ascertained and paid to him, together with interest or, at his option, the profits attributable to the use of his interest in the partnership's property since dissolution. N.Y. P'ship Law § 73. To the extent Merritt dissolved the partnership in contravention of the Partnership Agreement, Gardner is also entitled to damages for that breach. N.Y. P'ship Law § 69(2)(a).

236. *Gardner's contributions.* In settling the partners' accounts, Gardner is entitled to credit for what he contributed to the partnership, including Gardner's Binder, his briquetting process, slag process, customer lists/contacts, supplier lists/contacts, and the patent rights he assigned to NAMS II LLC.

237. Gardner has no adequate remedy at law. Merritt alone controls the partnership's property, the entities that hold it, and its books and records.

238. Gardner is therefore entitled to a judgment:

(a) declaring that the partnership was dissolved in January 2025 or, in the alternative, decreeing its dissolution;

(b) directing Merritt to account for all partnership property and profits, including the property held and profits earned by NAMS II LLC and the other entities Merritt formed;

(c) determining the value of Gardner's interest in the partnership as of the date of dissolution;

(d) directing Merritt to pay Gardner that value, together with interest or, at Gardner's election, the profits attributable to the use of his interest since dissolution;

(e) in the alternative, directing that the partnership's affairs be wound up under the Court's supervision, including by appointment of a receiver, sale of the partnership's property, and distribution of the surplus equally between Gardner and Merritt after the partners' accounts are settled; and

(f) awarding Gardner damages for Merritt's wrongful dissolution of the partnership.

## D. Fourth Cause of Action - Breach of Fiduciary Duty

239. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

240. Merritt owed Gardner fiduciary duties on three independent grounds. First, Merritt and Gardner were partners, and under New York law partners owe one another the duty of utmost loyalty, good faith, and full disclosure in all matters affecting the partnership. Second, in the Venture Agreement, Merritt and Gardner agreed to work together as co-

venturers to patent and commercialize Gardner's invention, and Merritt undertook to act for both of them in forming the company that would hold the patent and in prosecuting the patent through counsel of his choosing. Third, apart from any agreement, Merritt and Gardner stood in a relationship of trust and confidence. Gardner told Merritt that he was relying on him to structure the venture honestly and fairly, and Merritt told Gardner that he could trust him. Merritt held himself out as having expertise that Gardner lacked. He controlled the venture's capital, its lawyers, its bank accounts, and its books, while Gardner, having sold his only other business and committed his invention and his livelihood to the venture, depended on him. Merritt knew of that dependence and accepted the trust Gardner placed in him.

241. Merritt breached his fiduciary duties. From the outset, he structured the partnership's business to give himself total control over it and to freeze Gardner out. Among other things, Merritt:

(a) secretly formed NAMS I LLC with himself as its sole member one week before he signed the Venture Agreement promising Gardner an equally owned company, and never formed the company he had promised;

(b) signed the Exclusive Manufacturing Agreement, which barred Gardner's own supplier from making his binder for anyone but the business Merritt controlled;

(c) dissolved NAMS I LLC and replaced it with NAMS II LLC under the identical name, without telling Gardner, four days before Gardner assigned his invention to a company of that name;

(d) placed the partnership's trucks, its Missouri facility, and other parts of its business in separate entities that he alone owns or controls, outside any entity in which Gardner or his entity held an interest, and concealed those entities from Gardner;

(e) caused the Operating Agreement and the Incentive Agreement to give his own entity all voting control, the sole management of the company, sole control of its funds and bank accounts, and a $15,000,000 capital account it had not funded, while making the interest of Gardner's entity non-voting, unvested, and forfeitable at Merritt's discretion, and did not explain those terms to Gardner, including the provision requiring disputes to be litigated in Saint Johns County, Florida, where Merritt lives;

(f) kept for himself every source of information about the business, by dealing alone with the lawyers who formed the entities, instructing Gardner not to communicate with patent counsel, making himself the company's sole representative before the IRS, and denying Gardner access to the partnership's bank accounts, books, and financial statements;

(g) represented to the State of Indiana that the company had a single member, and reported the payments to Gardner's entity as compensation to an outside contractor;

(h) induced Gardner to give up 100,000 units with a promise to increase his draw that Merritt did not keep;

(i) placed his own friends, family, and former employees throughout the business to learn from Gardner what was needed to run it without him;

(j) removed Gardner from the business on a pretext, less than two months before the remaining units held by Gardner's entity were to vest, and declared all those units forfeited;

(k) refused Gardner's demands for the partnership's books and records; and

(l) has retained for himself all of the partnership's profits and the partnership's property, including the intellectual property contributed by Gardner.

242. Merritt did each of these things knowingly and for his own benefit, while Gardner was devoting himself full time to building the business in reliance on Merritt's assurances that he could be trusted.

243. Merritt's breaches directly and proximately caused Gardner's injury. By structuring the business so that he alone controlled it, and by concealing that structure, Merritt obtained Gardner's Binder, his know-how, his customer relationships, and two years of his labor, and then removed Gardner and kept the business for himself. But for Merritt's breaches, Gardner would hold an equal share of the partnership's business, its assets, and its profits, including the '018 Patent.

244. Gardner has no adequate remedy at law. What Merritt took is unique: a patent on Gardner's own invention and an ownership interest in an operating business. That property is held in entities Merritt alone controls, and its value and the profits it has generated cannot be determined without access to books and records that Merritt has refused to provide.

245. Gardner is therefore entitled to equitable relief, including: (a) a constructive trust for Gardner's benefit over one-half of the partnership's business and assets, including the '018 Patent and Merritt's interests in the entities that hold them; (b) an order restoring

Gardner's fifty-percent interest in the partnership's business and directing Merritt to convey to Gardner the interests necessary to effect it; (c) an accounting of the partnership's affairs and of all benefits Merritt has derived from his breaches; (d) rescission of the Assignment; and (e) an order restraining Merritt from transferring or encumbering the partnership's assets pending final judgment.

246. Merritt accomplished his breaches through misrepresentation and concealment. He told Gardner in December 2022 that the company he was forming would be a 50/50 partnership, and on December 29, 2022, he formed NAMS I LLC with himself as its only member. On January 5, 2023, he signed the Venture Agreement promising Gardner an equally owned company without disclosing that he had already formed one in his own name. On February 20, 2023, he sent Gardner the Operating Agreement without disclosing that its drafters were advising him personally or explaining any of its terms, and he told Gardner it was just a formality. On September 13, 2023, he represented to the State of Indiana that the company had a single member. And throughout the partnership, he concealed from Gardner the other entities he formed to hold the partnership's business and assets. As Merritt's partner, Gardner was entitled to rely on Merritt's statements and on his duty to disclose, and he did.

247. Merritt did not openly repudiate his obligations to Gardner as a partner until January 2025, when he removed Gardner from the business and declared Gardner's interest forfeited. Until then, Merritt continued to treat Gardner as his partner and to pay him a monthly draw against his share of the profits, and he had assured Gardner that he owned 50% of the company.

248. In addition, Gardner is entitled to compensatory damages for Merritt's breaches, including his removal of Gardner in January 2025 and his retention of the partnership's profits, in an amount to be proven at trial.

249. Merritt's breaches were intentional, were carried out through misrepresentation and concealment, and were directed at a partner who had entrusted him with his invention and his livelihood. Gardner is therefore also entitled to punitive damages.

### E. FIFTH CAUSE OF ACTION - ACCOUNTING (N.Y. P'SHIP LAW §§ 43, 44)

250. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

251. *Fiduciary relationship.* Gardner and Merritt are partners, and Merritt owes Gardner the fiduciary duties one partner owes another. Those duties include the duty to give Gardner access to the partnership's books, to render true and full information on all things affecting the partnership, and to account for any benefit or profit he derives from the partnership's business or the use of its property. N.Y. P'ship Law §§ 41, 42, 43.

252. *Merritt's control of the partnership's property and records.* From the start of the partnership, Merritt alone has controlled its money, property, and records. He formed and controls every entity through which the partnership's business is conducted. He controls their bank accounts. He retained and directed the lawyers and accountants. He decided how the partnership's income and expenses were recorded and reported. And since January 2025, he has had exclusive possession of the partnership's plants, contracts, and patent, and has received all of its revenue.

253. *Gardner has never received an accounting.* Merritt has never given Gardner a financial statement, a tax return, or any other record showing what the partnership has earned, what

it owns, what it owes, or what Merritt has taken out of it. Gardner does not know how much capital Merritt actually contributed, what the partnership's plants and contracts have earned, what has been paid to Merritt, his family members, and his other entities, or what property has been moved among the entities Merritt formed. That information is in Merritt's exclusive possession.

254. *Demand and refusal.* In January 2025, Gardner demanded access to the books and records of the business. On January 24, 2025, Merritt refused through his counsel at Gunster, asserting that Gardner had not stated "a proper purpose." A partner needs no purpose to see his own partnership's books. Merritt has provided nothing since, and this Complaint renews Gardner's demand.

255. *Right to an accounting.* A partner is entitled to a formal account of partnership affairs when he has been wrongfully excluded from the partnership's business or from possession of its property, when his partner has derived benefits from the partnership without his consent, and whenever other circumstances render an accounting just and reasonable. N.Y. P'ship Law § 44. Each of those grounds is present here. Merritt has excluded Gardner from the business and from possession of all of its property since January 2025. Merritt has kept for himself the profits of a business that belongs equally to both partners. And Gardner cannot determine what he is owed without the records Merritt refuses to produce.

256. Gardner has no adequate remedy at law. The amount due to him can be determined only by examining books and records that Merritt alone controls, across at least ten entities that Merritt alone formed.

257. Gardner is therefore entitled to a judgment:

(a) directing Merritt to render a full and complete accounting of the partnership's affairs from December 2022 to the present, including the affairs of NAMS II LLC and any other entities Merritt formed;

(b) requiring that the accounting include all property acquired, all revenue received, all expenses paid, all capital contributed, all profits earned, all transfers among the entities, and all payments, distributions, and other benefits to Merritt, his family members, and any entity he owns or controls;

(c) directing Merritt to produce the books and records necessary to verify the accounting; and

(d) awarding Gardner the amount found to be due to him, together with pre-judgment interest.

### F. SIXTH CAUSE OF ACTION - CONSTRUCTIVE TRUST

258. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

259. *Confidential and fiduciary relationship.* Gardner and Merritt were partners, and Merritt owed Gardner the fiduciary duties of a partner. Their relationship was also one of trust and confidence in fact. Gardner told Merritt that he was relying on him to structure their venture fairly, and Merritt took sole responsibility for forming its entities, directing its lawyers, prosecuting the patent, and keeping its books.

260. *Merritt's promise.* Merritt promised Gardner that the two of them would own the business equally. He made that promise orally in December 2022, when he and Gardner agreed to be equal partners. He made it again in writing on January 5, 2023, when he signed

the Venture Agreement promising a company "owned 50% each by Merritt and Gardner" to hold the patent on Gardner's invention.

261. *Transfers in reliance.* Gardner relied on that promise and transferred to the business, and to the entities Merritt directed, nearly everything of value he had. He disclosed Gardner's Binder and his briquetting process to Merritt. He signed the Assignment conveying his rights in the invention to North American Metallurgic Solutions, LLC. He gave up his interest in Sky Recycling. He brought the business his supplier, Supplier 5, and his customer relationships, including the relationship that produced the Customer 14 Agreement. And he contributed two years of full-time work designing and building the Central City Plant and the Indiana plant and developing the binder formulations they use.

262. *Unjust enrichment.* Merritt did not keep his promise. He placed the invention, the plants, the contracts, and the profits of the business in entities that he alone owns and controls, and in January 2025 he removed Gardner and declared that Gardner owns nothing. Merritt now holds, directly or through those entities, the whole of a business that was to be owned equally, including the '018 Patent that issued on Gardner's invention. He has paid Gardner nothing for any of it. Equity and good conscience do not permit Merritt to retain Gardner's half.

263. *The property subject to the trust.* The property Merritt holds in trust for Gardner includes:

(a) the '018 Patent, the Provisional Application, the Nonprovisional Application, and any other patent or application claiming priority to them or disclosing Gardner's Binder;

(b) Merritt's ownership interests, direct and indirect, in NAMS II LLC and the other entities he formed to conduct the partnership's business;

(c) the property those entities hold, including the Central City Property, the Central City Plant, the Indiana plant, the Customer 14 Agreement, and the business's other customer and supplier contracts; and

(d) the profits, distributions, and other proceeds Merritt and his entities have received from the business, and any property acquired with them.

264. Gardner has no adequate remedy at law. The invention he assigned is unique. The entities that hold it, and the rest of the partnership's property, are under Merritt's exclusive control, and Merritt has shown that he will move property among entities of his own creation without notice to Gardner.

265. Gardner is therefore entitled to a judgment:

(a) imposing a constructive trust for Gardner's benefit on a one-half interest in the property described above;

(b) in the alternative, and to the extent the Court finds that the equally owned company Merritt promised was never formed, imposing a constructive trust for Gardner's benefit on the whole of the patent rights he conveyed by the Assignment, including the '018 Patent;

(c) directing Merritt to convey the trust property to Gardner, or to cause the entities he controls to do so, and to account for all proceeds of it; and

(d) enjoining Merritt from transferring, encumbering, or dissipating the trust property pending that conveyance.

## G. Seventh Cause of Action - Correction of Inventorship under 35 U.S.C. § 256

266. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

267. This claim arises under the patent laws of the United States. The ’018 Patent names two inventors, Gardner and Merritt. Gardner is the sole inventor. Merritt did not contribute to the conception of any claim, and he is named through error.

268. *The claimed invention.* The ’018 Patent has thirteen claims. Each is directed to a binder, or to a briquette made with it, and none claims a process. The independent claims recite a binder mixture of polyvinyl alcohol resin, phenolic resin, an ester-based hardener, and water, in specified proportions, combined in the briquette with a steel by-product and a resin powder. The dependent claims add a powdered phenolic novolac resin, dry cellulose matter, specified crush strengths and cure times, and certain additives.

269. *Gardner alone conceived the invention.* Every element of every claim originated with Gardner. He conceived the binder’s combination of ingredients and their proportions before he met Merritt. He determined the resin powder and cellulose additions, the dosing, and the strength and cure characteristics through his own formulation work and testing. He likewise conceived the additives recited in the dependent claims. On January 13, 2023, Gardner delivered to Merritt a written description of the binder’s composition, ingredients, dosing, and production process, and the patent application was prepared from that description.

270. *Merritt contributed nothing to conception.* Merritt had no training or experience in metallurgy, resin chemistry, or briquetting. He came from the fertilizer business. He first learned of Gardner’s Binder from Gardner in late 2022, when it was already formulated. His role in the patent was to hire the lawyers, pay them, and relay to them what Gardner had

given him. Supplying capital, retaining patent counsel, and passing along another person's invention are not acts of conception.

271. Merritt's own statements confirm that the invention was Gardner's. In its January 24, 2025, letter, Gunster described the subject of the patent application as an "allegedly proprietary formulation" that Gardner had provided and asserted that the application rested on Gardner's representation that he had invented it. On June 9, 2025, Merritt told a court that Gardner "stole the formula from his previous employer." That accusation is false, but its premise is telling: even on Merritt's account, the formula came to the business through Gardner. Merritt has never identified any element of any claim that he conceived.

272. *The Venture Agreement does not make Merritt an inventor.* The Venture Agreement, which Merritt prepared, recites that Merritt "suggested useful improvements to the process of making the metallurgical briquettes." Merritt wrote that recital on January 5, 2023, eight days before Gardner delivered his written description of the binder. The recital does not identify any improvement, and no claim of the '018 Patent is directed to a process. Everything included in the claims was conceived of and reduced to practice by Gardner before he met Merritt.

273. *The error.* Merritt was named as an inventor at his own direction. He selected and instructed patent counsel, and he decided who would be named. Gardner had no experience with patents, as the Venture Agreement itself recites, and he relied on Merritt and Merritt's counsel to prepare and file the application correctly. Gardner signed the papers Merritt's counsel presented to him without understanding the legal requirements for inventorship and without being advised of them.

274. *Gardner's interest in correction.* Gardner has a concrete stake in the correct inventorship of the '018 Patent. He has an ownership interest in the patent as a partner in the partnership whose property it is. He has a professional and reputational interest in being recognized as the sole inventor of the binder on which his standing in the steel by-products industry rests, an interest Merritt has attacked directly by accusing him of stealing it. And Merritt relies on his status as a named inventor to claim rights in, and control over, an invention that was never his.

275. Gardner is therefore entitled to an order under 35 U.S.C. § 256(b) directing the Director of the United States Patent and Trademark Office to issue a certificate correcting the '018 Patent to remove Merritt as a named inventor, leaving Gardner as its sole inventor.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Declaring that Gardner and Merritt formed a partnership in or about December 2022; that Gardner owns a fifty-percent interest in it; that the business conducted through NAMS II LLC and the other entities Merritt formed, and the assets of that business, including the '018 Patent, are partnership property; and that Merritt's purported termination of Gardner did not extinguish Gardner's interest;

B. Awarding Gardner compensatory damages in an amount to be determined at trial for Merritt's breaches of the Partnership Agreement and of his fiduciary duties;

C. Ordering Merritt to restore Gardner's fifty-percent interest in the partnership's business, including by conveying to Gardner, or causing the entities he controls to convey, the interests necessary to effect it;

D. Ordering Merritt to disgorge all profits and benefits he obtained through his breaches of fiduciary duty;

E. Ordering Merritt to render a full accounting of the partnership's affairs from December 2022 to the present, and awarding Gardner the amount found to be due;

F. Declaring the partnership dissolved or decreeing its dissolution, determining the value of Gardner's interest, and ordering Merritt to pay Gardner that value together with interest or, at Gardner's election, the profits attributable to his interest since dissolution; or, in the

alternative, ordering that the partnership be wound up under the Court's supervision and its surplus divided equally;

G. Imposing a constructive trust for Gardner's benefit on the '018 Patent, Merritt's interests in the entities he formed, the property those entities hold, and the proceeds of the business, and enjoining Merritt from transferring or encumbering that property;

H. Directing the Director of the United States Patent and Trademark Office, under 35 U.S.C. § 256, to issue a certificate correcting the '018 Patent to name Gardner as its sole inventor;

I. Awarding Gardner punitive damages for Merritt's breaches of fiduciary duty;

J. Awarding Gardner pre-judgment and post-judgment interest, costs, and attorneys' fees to the extent permitted by law; and

K. Granting such other and further relief as the Court deems just and proper.

Dated: November 20, 2026

STOKES LAW PLLC

*/s/ Houston A. Stokes*

Houston A. Stokes
Church Street Station
P.O. Box 478
New York, NY 10008
(773) 936-0722
houston@houstonstokeslaw.com

Christopher L. Evans*
OFFOR EVANS PLLC
Mockingbird Station, P.O. Box 600053
Dallas, TX 75360
214-593-9121
chris@offorevans.com
*Pro hac vice application pending

Attorneys for Plaintiff
James John Gardner